We'll move now to our final case of the day. This is Appeal 24-1827, United States v. John Sand, and Mr. Reed will begin with oral argument from you. Judge, as it may please the Court, Peter Reed for the United States. Traditional health insurance defines a customer's costs and shifts the risk of high medical bills to the insurer. The telemarketing outfit where Defendant John Sand worked as the vice president of sales made customers think they were getting something similar to that, but in fact they were selling limited indemnity policies, which limits the insurance company's costs and has no risk shifting and no out-of-pocket maximum. That's why they're typically supplemental policies, not primary policies. The jury found that that was fraud and convicted Sand on all counts. Sufficient evidence supports sending that case to the jury on the issue of intent for the many reasons outlined in the briefs, a few of which I'll focus on today. The first is that any rational trier of fact could find, based on the co-conspirator testimony at trial, that Mr. Sand had the requisite intent. The testimony of the co-conspirator, another executive, Ms. Gerard, in this case was frankly very black and white. She was asked, what was the fraud being committed at this company? Well, it was deceptive sales practices through the use of misleading sales scripts. Who did you conspire with to commit that fraud? Well, the defendant, Mr. Dorfman, the defendant, Mr. Sand. You have that kind of testimony on the record, and you have a jury verdict, and you're under Rule 29, that's the end of the game. And that's what this court's case in Anderson says. Look, when you've got a conspirator who testifies that I conspired with these people to commit this kind of fraud in this kind of company, well, the credibility determinations go in the way of the jury's verdict. You've got two witnesses, and one says he joined the conspiracy, and one says he didn't. Well, you've got to go with the co-conspirator and the jury's verdict. The second reason is the sales scripts themselves, which the government contends are facially misleading in a number of ways. Any rational finder of fact could find that the facial, misleading nature of these sales scripts is plenty of reason to send this case to a jury, and therefore uphold the jury's  A number of those misleading statements are outlined in the script, but I'll touch on a few of them. But the broad point here is that this defendant, Mr. Sand, was the one who was in charge of making sure that these sales scripts are used. Mr. Sand personally used those misleading sales scripts, or oversaw their use, every single day that this company was in operation for six years. And did that come from Girard? Did that argument or that piece of evidence come from Girard's testimony that Mr. Sand was in charge of making sure these scripts were used? It came from both her testimony and from Mr. Sand's own testimony. If you look at the transcript, day 10 at 67 through 70, he talks about being the vice president of sales, and what that involved, it involved listening to or monitoring sales calls all day long. And that's a transcript also day 10 at 87 and 89 through 91. John Sand's the man, and where this fraud is occurring is on his sales floor. The rest of this operation is just trying to hide what's happening on the sales floor, which is misleading all of these customers by telling them they're getting one thing and then selling them something else. So a few examples of those sales scripts and how Sand knew that they were misleading, not just facially, but in other communications that made him aware of that. One, Sand himself, and more generally all sales agents, were trained about what major medical or traditional health insurance really means. He was trained, and this is Government's Exhibit 6, that there are three musts to have major medical, a deductible, a copay, and a maximum out-of-pocket. The sales script, in specific contrast with the sales agent training, tells customers that there are two musts for a product to be a major medical. Why do they leave out the maximum out-of-pocket? Because they do not want customers to know that the product they're selling has no maximum out-of-pocket risk. And I think one of the most damning things that occurred on Mr. Sand's cross is when he was asked, well, is that kind of a big deal that customers' costs are not going to be capped? He said, well, it's a difference, but a significant difference? Well, I'm not willing to say that, right? It's a consciousness of guilt, what was important to the consumer, that their costs were going to be capped or whether they're going to not be capped here. Obfuscation all the way down, specifically defining major medical incorrectly to the customer on the sales calls that they won't know what's going on. Another example, limit indemnity, of course, is specifically defined by the fact that the insurance company is only making limited payments. So what did this sales script say? Well, it said there were no limits on the plan's usage, right? Diametrically the opposite of the product they're selling, it's a limited indemnity plan, the sales script says no limits on the plan's usage. The plan administrator who Simple Health is selling on behalf of will occasionally do what they call these, they're like undercover calls, right, where they call in, they pretend to be a customer, and then they send a report to Simple Health. And one report that went to John Sand specifically described this statement, no limits on the plan's usage, as misleading, went directly to Mr. Sand. Mr. Reed, page five of the district court's decision on motions after verdict is talking about why the district court concludes that Sand did not knowingly devise or participate in a scheme to defraud. You're laying out the evidence that the jury was presented with, obviously we have the jury verdict and the applicable standard. Is there a distinction on page five or page six in the judge's ruling that we're not picking up on or that you want to specifically address in the way that he says Sand did not participate in the scheme you're describing? Yes, Judge. Respectfully to the district judge, I think it's a misunderstanding of the Rule 29 standard. In the section that you're describing, he describes what he calls conflicting testimony. And because there's conflicting testimony, he grants the motion. But of course, conflicting testimony is classic jury territory, right? If there's conflicting testimony, boy, that's a case for the jury, not for the judge under Rule 29. I think there are a few other things in what the judge says. He also references what we refer to as off-script lies. So there were times where you would have sales agents who would take these statements in the sales scripts and kind of make the less subtle way of doing it, right? So the sales scripts say, oh, we're selling major health insurance. But an agent might say, we're selling Blue Cross. Or the sales scripts might say, you get up to 70% off. But the sales agent would say 70%, right? And so the judge in his orders said, well, it's not clear that there's anybody out there that was making these off-script kind of bald-faced lies that wasn't removed. But I think, in fact, there was testimony. It was the testimony of Katrina Ruth, who specifically described three people who got after John Sand was told, these people are going off-script. They're making the bald-faced lies. Those kind of people, in her experience, were promoted, not removed. And so I think that testimony, it's on the record. And really, that distinction between up to 70% when we know 70% is a bald-faced lie, that's intentioned defraud, right? If we're making a distinction between up to 70% is technically not falsifiable, but 70% absolutely blatant lie. And John Sand said this on cross-examination. Well, that's intentioned defraud because you want your customer. You want to say one thing, and you want your customer to hear something different. That's intends to deceive. That's intends to defraud. And I'll reserve the remainder of my time. Very good. Thank you, Mr. Reed. Mr. Radefeld will now recognize you for argument on behalf of the appellee. Thank you, Jerry. May it please the Court, Mr. Reed, my name is Matthew Radefeld, and I was appointed under the Criminal Justice Act to represent the appellee, John Sand, in the government's appeal of the trial court's granting Sand's motion for judgment of acquittal after the jury's verdict of guilty on all counts was returned. Now, as sometimes what happens when you're preparing for oral arguments, there are some things that may be brought up when you're reading the briefs and reading the law. And I will say that neither party addressed the fact that the trial court actually reserved ruling on Sand's motion for judgment of acquittal at the close of the government's case on day nine of the day 12 trial. And I think this ultimately addresses the standard of review in this matter. According to Rule 29, Subsection B, it states that if the court reserves ruling, I'm sorry, reserves decision on the judgment of acquittal, it must decide the motion on the basis of the evidence at the time that the ruling was reserved. Now, this part of the rule seems to create kind of a stop point in the trial wherein the trial court's determination of whether the evidence viewed in the light most favorable to the government exists was sufficient enough for a reasonable juror to find Sand guilty beyond a reasonable doubt was simply not satisfied here, which is the ultimate baseline here. Because during the post-verdict hearing on Sand's motion for judgment of acquittal, the trial court stated that it did not believe that the government made the case originally against Sand, but wanted to make sure that there would not be another trial, so it allowed the matter to be submitted to the jury. But the trial court was clear that it believed that the government did not prove its case against Sand beyond a reasonable doubt in its case in chief. Then the trial court supplements its in-court statements with a written order spelling out its finding of facts. And within this order, the court acknowledged the high burden of granting a judgment of acquittal. But in this instance, from sitting in a nine-day trial, if subsection B of Rule 29 is followed, or even if after the remaining three days of trial are considered, the trial court did not believe that the evidence viewed in a light most favorable to the government would have led a reasonable juror to find Sand guilty beyond a reasonable doubt. Mr. Radefeld, how do you get around the cooperator's testimony? How do you get around what Ms. Girard got on the stand and said that she had conspired with Sand and others to engage in these deceptive sales practices, and consumers on the phone would be deceived with the scripts that were read by Sand and overseen by Sand, and that he had even two scripts in one situation where the health care company said, you have to use this one because it's accurate, and he would only use that one when he knew the health care company was monitoring it? The standard is so high on a Rule 29. Could a rational trier of fact have found him guilty beyond a reasonable doubt? If we just accept all of the cooperator's testimony, why couldn't a rational trier of fact have found Mr. Sand guilty beyond a reasonable doubt based just on that testimony? Yes, Judge. I believe the trial court addressed this exact, I think, issue in the written order where most of the evidence that was heard was, especially from Ms. Girard, that there was a lot of speculation. There was a lot of pure... I just read directly from what you said, that she, Sand, and Dorfman agreed to commit fraud through deceptive sales practices with consumers on the phone and that the scripts were misleading and deceptive. Maybe it wasn't the strongest case ever, but that's not what the standard is for Rule 29. Correct, Judge. But the totality of the individual's evidence, I believe what the court was just referring to was the answer upon direct examination from the prosecutor at the tail end of examining the co-conspirator. So it's a conspiracy, yes. You did this, yes. But from all the time beforehand, before all that, there was a, well, he should have known, well, he could have known, or he would have known that. And all of these speculations that were even brought up by Ms. Girard were not saved by the ostrich instruction given to the jury, wherein the government did not present any evidence that Sand took steps to avoid knowing that something illegal was going on. So Ms. Girard, what the court did say, that Mr. Sand was selling a product that was legal that was told to him by, or following a script that was approved by the third-party administrator, and that you heard from the government's own witnesses that these policies that they were selling, that these policies sell themselves. So this isn't kind of like a methamphetamine case where the product here was legal and then sold and purchased by hundreds of thousands of people in the United States. So it kind of left the sole issue in the case to be the way, it was the way that Simple Health sold the policies. And it was told through the government's own witnesses as well that these scripts were being used industry-wide and that John Sand was told to have his sales agents use these industry-wide scripts by the third-party administrator. And Sand was told that the TPA, the third-party administrator, approved the scripts, and there was no evidence that proved that Sand should have known that these industry-wide approved scripts were false or misleading. And the government's focus on these two scripts being used, but there was no evidence other than that the two scripts were sometimes being used at a point where it was like testing out a new product in a market. And was Sand told to switch the scripts at a certain time? Yes, at the directions of others. But there was no evidence that Sand was purposely doing things behind the compliance department's back when the script would be changed improperly or falsely. That the evidence that was presented that never showed that Sand was part of any expressed or implied agreement to actually be part of this conspiracy or to allow or encourage his sales agents to go off script and make these false statements. When John Sand was on that sales floor using this script and being told that it was okay to use that script, there was nothing misleading or that he would have known or should have known that they were misleading or false. In fact, the government presented certain witnesses in this case. And this actually goes to counts 2 through 13 here, where the prosecutor relies heavily on United States v. White. And in that particular case, the co-defendant, Ford, was personally involved with all the scheming and the preparation of each fraudulent mortgage paperwork. And then the wire occurred after that. And that's not even close to what we have here. In counts 2 through 13, the government never presented a single piece of evidence that Sand was actually the supervisor on duty when those sales agents sold those policies. Or that John Sand was even in the same call center since they had call centers in different states and in different locations. The government never presented any evidence that Sand was even working that day. However, these witnesses that were brought in, and they talked about some of them received a much more significant benefit than they would have paid in a major medical plan. And that there were literally pennies on the dollar saved for some of these people. That's not false. That's fact. And the majority of these government witnesses kept these plans for a significant period of time. One kept his plan for four years, paid significantly less money than he ever would have spent on a major medical plan, but now he cries foul. And the government's own expert witness, who was a retired government agent, said that a person could purchase one of these plans, be absolutely satisfied with it, keep it for years, and yet the government would still consider them to be a victim. That does not make any sense. And the trial court saw through this and concluded that the jury's verdict in this case was based on speculation and guilt by mere association. And the trial court did not, as the government accuses it of doing, substitute its own views for those of the jury. It didn't fail to weigh the evidence in the light most favorable to the prosecution. And it did not fail to consider the jury's apparent credibility findings. Simply put, the trial court reserved rulings on Sand's motion for judgmental acquittal at the end of the government's case, and it was hopeful that the jury would get it right. But they didn't. The trial court knew the breadth of the legal standard to say that defendant Sand was improperly found guilty by the jury. And the court soundly ordered that the evidence submitted at trial by the government, as a whole, was insufficient for a rational jury to find guilt beyond a reasonable doubt on the charges against John Sand, as he cannot be convicted on allegations based on speculation and mere association. And that is all the government presented to the jury. And the trial court knew this and ruled accordingly. For these reasons, and on behalf of the appellee, John Sand, we ask that you affirm the order of the district court and allow judgmental acquittal on all counts. Thank you. Thank you very much, Mr. Ratafeld. Mr. Reed, I'll recognize you now for rebuttal argument. Simple Health got cease and desist letter after cease and desist letter from companies that benefited from Simple Health making sales. Unified Health sent them a cease and desist letter. Stop selling our products. Why? Because they were being deceitful. And who was being deceitful? John Sand's sales agents. And another cease and desist letter from HII, the plan administrator. HII, back in 2015, sent a cease and desist letter to Simple Health that said stop saying up to 70%. Stop telling customers they're going to get that because they're hearing 70%. Cam Gerrard testified. She sent this out time and time again. Got to get this language out. We've got to get this language back out. She testified that Mr. Sand and Mr. Dorfman conspired behind her back, behind compliance, to repeatedly put it back in. Three years later, in 2018, the use of that language was the chief complaint from customers. I thought I was going to get 70%. I thought I was going to get 70%. And Sand was not just a passive manager of an entire sales floor. He specifically was involved in this precise project. Not only Gerrard's testimony, but if you look at Government's Exhibit 146, there are handwritten notes by Mr. Sand putting this language back in the script, adding deceptive language to the sales script. And if you look at his cross-examination, he denies initially that he wrote those. Was 146 admitted during the Government's case in chief? Yes, Judge, 145. Not during the cross-examination? Correct, Judge. He looked at those notes and he said, I don't want to have to take credit for those. He denied it. Had to be shown a handwritten sample, at which point he conceded, yes, I was the one making notes about changes to the deceptive sales script. For all these reasons, we'd urge you to reverse the judge's order and affirm the jury's verdict. Thank you, Mr. Reed. Mr. Rattefeld, you were appointed by the court. You have the great thanks, you and your firm, for your strong advocacy in the case. The same thanks to Mr. Reed. The case will be taken under revision. Yes, sir. Thank you. That will close our hearings for the day.